UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-60565-CIV-DIMITROULEAS/SNOW

CONSTANCE GOMEZ,

           Plaintiff,

           vs.

ANDREW SAUL,
Commissioner of Social
Security Administration,

           Defendant.
_____/

## REPORT AND RECOMMENDATION

This cause is before the Court on Plaintiff's Complaint seeking judicial review of a final decision of the Social Security Administration denying the Plaintiff's application for disability benefits. The Complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 401, et seq., and was referred to United States Magistrate Judge Lurana S. Snow for a Report and Recommendation.

## I. PROCEDURAL HISTORY

The Plaintiff filed an application for disability benefits on September 9, 2016, alleging disability since July 31, 2014 as a result of fibromyalgia, depression and other ailments. The application was denied initially and upon reconsideration. The Plaintiff then requested a hearing, which was held before Administrative Law Judge Robert Gill on December 10, 2018. The Administrative Law Judge (ALJ)

found that the Plaintiff was not disabled within the meaning of the Social Security Act.  The Appeals Council denied the Plaintiff's request for review on January 30, 2020.  The Plaintiff then filed this action seeking judicial review of the decision of the Commissioner.

## II. FACTS

The Plaintiff was born on March 6, 1964 and has a high school education.  Her past employment was as a customer service clerk, hand packager and order clerk, She first filed for disability benefits on March 16, 2012, alleging disability since November 5, 2011.  After a hearing held on April 23, 2014, ALJ Mary Brennan denied the Plaintiff's application.  (R:36-46, 234-35, 267-68)

The medical record reflects that on April 4, 2012, Barry Waters, M.D., a rheumatologist at Arthritis Specialists, PA, authored a letter in which he states that the Plaintiff had been under his care for a long time and that she suffered from very severe fibromyalgia with diffuse pain and severe fatigue.  Dr. Waters noted that an extensive workup had revealed no other plausible explanation for the Plaintiff's symptoms and despite treatment (currently tramadol), the Plaintiff remained incapacitated by pain and fatigue.  Dr. Waters opined that the Plaintiff was incapable of any employment. (R:473)

On March 18, 2013, a psychiatric evaluation of the Plaintiff was conducted by Hernan Pabon, M.D. at Henderson Behavioral Health.  The Plaintiff reported a history of depression which had been treated with Lexapro and Paxil.

The Plaintiff stated that she suffered from fibromyalgia and was taking tramadol and Flexeril.  On June 13, 2013, Paul Zimmerman, LCSW at Henderson noted that Vistaril and Buspar had been prescribed that day.  (R:476-77)

On June 9, 2014, the Plaintiff presented to the Emergency Department of Broward Health Medical Center, complaining of moderate dull pack pain. Examination of the Plaintiff's back revealed normal range of motion, with diffuse mild lumbar tenderness.  The Plaintiff was instructed to take Advil for 48 hours and to return if no improvement.  (R:1119-21)

On January 4, 2015, the Plaintiff returned to the Broward Health Medical Emergency Department complaining of dull and aching thoracic pain. Examination revealed left lateral thoracic tenderness and swelling, but normal range of motion and strength. Chest X-ray also was normal. Ibuprofen and cyclobenzaprine were prescribed, and the Plaintiff was instructed to follow up with her primary care physician.  (R:1109-1112)

On February 25, 2015, the Plaintiff presented to the Broward Health Community Health Services for laboratory tests.  She reported a pain level of 8 on a scale of 10. The assessment included fibromyalgia (treated with tramadol), pre-diabetes, obesity and depression. (R:484-85)

 On September 9, 2015, the Plaintiff returned to the Broward Health Emergency Department complaining of minimal generalized body pain.  The Plaintiff denied back pain, and her range of motion and strength were normal.  She

3

was discharged with prescriptions for ibuprofen, Norco and Neurontin, with a recommendation for follow-up with a rheumatologist. (R:1090-94)

On October 5, 2015, the Plaintiff presented to Susana Brandt, M.D. for follow-up after her September Emergency Department visit.  The Plaintiff complained of muscle and joint pain.  Examination revealed that the Plaintiff was 5'2" tall and weighed 191 pounds; the Plaintiff had normal range of motion and strength, but had tenderness in her neck, shoulders, upper arm, thighs and lumbar spine.  Dr. Brandt diagnosed pre-diabetes, fibromyalgia and depression.  The doctor's plan was to continue the Plaintiff on Neurontin and referral to a rheumatologist for fibromyalgia, and she recommended Zoloft, as per mental health provider, for depression. (R:488-92)

On December 9, 2015, the Plaintiff was transported to Broward Health Medical Center Emergency Department following a fall during which her ankle was injured.  X-ray revealed a non-displaced fibular tip fracture of the left ankle.  The Plaintiff was discharged with a splint and prescriptions for Norco and ibuprofen. On December 16, 2015, the Plaintiff followed up at Broward Health Community Health Services with Michael Madden, D.O.  The splint was removed and the Plaintiff was given a walker boot. (R:1069, 1083-87)

On January 11, 2016, the Plaintiff returned to Dr. Brandt.  Musculoskeletal examination revealed normal strength; normal gait with left ankle tenderness, and no other tenderness or swelling.  Dr. Brandt added meclizine (for vertigo) to the

4

Plaintiff's current medications of ibuprofen and Zoloft.  On January 13, 2016, the Plaintiff followed up for her ankle injury with Alicia Ballard, D.O. at Broward Health Community Health Services.  The Plaintiff reported much improvement and stated that her pain was controlled by taking Motrin at night.  She was not taking any other pain medication.  Dr. Ballard advised the Plaintiff that she could try to transition from the boot to a shoe in 2 weeks.  The Plaintiff was to return for repeat X-rays in 4 weeks. (R:499-503, 1063-64)

On March 2, 2016, the Plaintiff presented to the Broward Health Medical Center Emergency Department complaining of abdominal pain.  Physical examination revealed that the Plaintiff's back was non-tender.  The Plaintiff had normal strength and range of motion. Based on ultrasound results, the Plaintiff's gallbladder was removed on March 30, 2016.  The post-operative diagnosis was cholecystitis with intrabdominal adhesions.  (R:1048-53, 1030-31)

On April 19, 2016, the Plaintiff presented to the Broward Health Emergency Department with a sprained left ankle.   (R:1004-07) On April 29, 2016, the Plaintiff was evaluated by Kevin B. Shrock, M.D., an orthopedic surgeon.   Dr. Shrock advised the Plaintiff that there were no new fractures to her left ankle and referred her to physical therapy, which she began on May 3, 2016.  (R:512-13, 520)

An MRI of the Plaintiff's left foot was performed on June 3, 2016.  It revealed marrow edema in the cuboid bone indicating a stress reaction or stress fracture.  On June 6, 2016, the Plaintiff returned to Dr. Shrock for evaluation of continued pain

in her left foot.  After review of the MRI results, the doctor advised the Plaintiff that she did in fact have a cuboid stress fracture which was nondisplaced.  The Plaintiff was to wear her walker boot instead of using a cane.   He estimated that her symptoms should recede within 6 to 8 weeks.  (R:514-15)

On June 28, 2016, the Plaintiff returned to Henderson Behavioral Health, where she met with Joanne Willis, A.R.N.P.  Mental status examination revealed coherent speech; logical thought process; circumstantial associations; intact orientation; fair recent and remote memory, attention and concentration, language, fund of knowledge and judgment, and euthymic mood. The Plaintiff was stable and denied depressive symptoms, but stated that she felt Zoloft wore off by evening. Ms. Willis increased the Plaintiff's Zoloft to 100 mg.  (R:480)

On August 5, 2016, the Plaintiff followed up with Dr. Shrock.  She reported that she had been wearing shoes and using a cane because the boot was too heavy. She complained of shooting pain in her ankle and had stopped physical therapy because it was painful.  X-rays showed no displacement of the cuboid fracture.  Dr. Shrock recommended that the Plaintiff use a short walker boot, and decided to hold off on physical therapy.  (R:516-17)

The Plaintiff returned to Ms. Willis at Henderson on September 20, 2016. She stated that she had experienced improvement with the increase in Zoloft, but became anxious when it wore off.  The Plaintiff slept well with trazodone and denied depressive symptoms.  Mental status examination yielded the same results

6

as on the Plaintiff's previous visit, except that her mood was calm rather than euthymic. (R:479)

On October 31, 2016, the Plaintiff returned to Dr. Shrock.  She reported much improvement in her left foot.  She experienced pain along the lateral ankle every week or two, but it was relieved by prescription Voltaren.   X-rays were consistent with healing of the cuboid stress fracture. However, the Plaintiff had developed a problem with numbness in her left lateral thigh.   Dr. Shrock determined that no action was required because the Plaintiff did not experience pain in her thigh, but provided the Plaintiff with information on the nature of meralgia paresthetica.  (R:510-11)

On December 1, 2016, the Plaintiff presented to Dr. Barry Waters, rheumatologist for the first time since 2013.  She stated that her fibromyalgia symptoms had worsened, complaining of generalized, moderate sharp pain.  The Plaintiff denied joint swelling, severe fatigue, prolonged morning stiffness, fever or interference with activities of daily living.   However, she did experience muscle aches, as well as joint and back pain.  Physical examination revealed tenderness to palpation at both elbows, shoulders and knees.  The Plaintiff had full range of motion with normal gait and station.  Mental status examination showed normal mood and affect with intact recent and remote memory.  The Plaintiff told Dr. Waters that she could not tolerate Cymbalta or Savella and would like to try something new.  Dr. Waters planned on starting the Plaintiff on Lyrica.  (R:530-33)

On December 13, 2016, the Plaintiff reported to Ms. Willis at Henderson Behavioral Health that she was doing well on her medications and rarely needed to use trazodone. She denied any side effects from her medication. Mental status examination was the same as on the Plaintiff's September visit. (R:478)

The Plaintiff returned to Dr. Waters on December 15, 2016. Physical examination showed full range of motion and no swelling. However, the Plaintiff exhibited tenderness to palpation in her elbows, shoulders and knees. Dr. Waters started the Plaintiff on Lyrica. (R:527-30_

On January 13, 2017, the Plaintiff presented to Asha Gupta, M.D. at Broward Health Community Health Services for routine checkup. Musculoskeletal examination revealed normal strength and range of motion, with no tenderness. At the Plaintiff's request, Dr. Gupta provided a referral to Dr. Waters for fibromyalgia treatment. A bone density scan performed on February 2, 2017, showed significant osteopenia in the Plaintiff's lumbar spine and left hip. (R:538, 544)

On March 7, 2017, the Plaintiff returned to Ms. Willis at Henderson. For the first time, Ms. Willis noted a diagnosis code of 296.32 Affective Psychosis, Major Depressive. As in prior visits, however, the Plaintiff denied depression. She stated that her fibromyalgia was acting up and that she was experiencing restless leg syndrome, which she attributed to Zoloft. Ms. Willis decreased the Plaintiff's Zoloft dosage and added gabapentin. (R:523)

On March 11, 2017, a Mental Residual Functional Capacity Assessment of the Plaintiff was performed by Byron T. Pack, Psy.D., a non-examining state agency psychologist.  Dr. Pack opined that the Plaintiff had no understanding and memory, social interaction or adaptation limitations.  However, she did have moderate limitations in the ability to carry out detailed instructions and in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Dr. Pack assessed that the Plaintiff could understand, retain and carry out simple instructions and could perform some complex tasks.  She could consistently and usefully perform routine tasks on a sustained basis, with minimal (normal) supervision, and could cooperate effectively with the public and co-workers in completing simple tasks and transactions.  Dr. Pack stated that these limitations were not attributable to the Plaintiff's mental illness, but were based on the medical portion of the record. (R:283-85)

On March 13, 2017, the Plaintiff was evaluated by Dr. Viswanath, a colleague of Dr. Waters at Arthritis Specialists.  The Plaintiff told the doctor that her insurance provider had declined to approve Lyrica, with the result that the Plaintiff was not taking any medication and her symptoms were unchanged since the preceding visit.  The Plaintiff was appealing the insurance decision. Musculoskeletal examination revealed limited range of motion in the Plaintiff's

9

cervical spine with trigger point tenderness described as "multiple." Dr. Viswanath indicated that the physician portion of the Plaintiff's appeal of the Lyrica decision had been completed and the prescription was re-submitted. (R:524-25)

On March 24, 2017, the Plaintiff presented to Dr. Gupta for lab results, which indicated high cholesterol, borderline diabetes and vitamin D deficiency. The Plaintiff reported increasing pain throughout her body. She stated that she was taking Zoloft and trazodone for anxiety and depression, and was doing well. The Plaintiff was to continue treatment with Dr. Waters. (R:545-50)

On March 28, 2017, a consultative physical examination of the Plaintiff was performed by Marie F. Adam, M.D. The examination revealed no abnormalities of the ears, nose or throat. The Plaintiff was able to hear and understand normal conversational speech. Examination of the Plaintiff's back revealed tenderness in the cervical and lumbar spine. Grip strength and fine manipulation were normal, but supine and seated straight leg raise tests were positive. Gait was normal with no assistive device, but neck and low back pain significantly limited the Plaintiff's range of motion. The Plaintiff displayed anxiety and sadness, and reported insomnia, loss of memory and difficulty concentrating. Dr. Adam's diagnostic impressions were osteopenia, lumbar radiculopathy and depression. (R:561-64)

On May 15, 2017, the Plaintiff met with Dr. Waters after taking Lyrica for 3 weeks. She reported little to no improvement of her symptoms, which consisted of pain in her hips, shoulders, wrists, elbows, ankles and feet. Physical examination

showed limited range of motion in the Plaintiff's cervical spine as well as trigger point tenderness. The Plaintiff's gait was normal, as well as motor strength and tone. Dr. Waters recommended that the Plaintiff continue with Lyrica at an increased dosage for several weeks and that she increase activity, continue treatment for depression and undergo a sleep study. (R:578-79)

On May 20, 2017, Ronald Chase, M.D., a non-examining state agency psychiatric consultant, completed a Mental Residual Capacity Assessment of the Plaintiff. Dr. Chase opined that the Plaintiff was capable of understanding and retaining simple instructions. However, she had moderate limitations in her ability to carry out detailed instructions. She was not significantly limited in her abilities to maintain attention and concentration for extended periods, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them or to make simple work-related decisions. (R:298-99)

Despite moderate limitations in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, Dr. Chase believed that the Plaintiff had sufficient ability to sustain concentration, persistence and pace for an extended period and should be able to complete simple tasks at an appropriate pace, and to sustain this level across days and weeks. The Plaintiff did not have social interaction limitations and could

11

cooperate on simple, routine tasks and transactions.  However, she might function best at tasks with limited social demands.  Dr. Chase found that the Plaintiff had no adaption limitations and was capable of adapting adequately to changes and demands of simple tasks.  Dr. Chase noted that there was no evidence that the Plaintiff suffered from overt psychosis, formal thought disorder or impaired reality testing.  Likewise, there was no established disorder of perception or putative cognitive disorder, and no psychiatric hospitalizations.  (R:299)

On May 30, 2017, a Physical Residual Functional Capacity Assessment of the Plaintiff was completed by Larry Meade, D.O., a non-examining state agency physician.  Dr. Meade opined that the Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently; could stand/walk or sit for a total of 6 hours during an 8-hour workday, and had an unlimited ability to push/pull within weight restrictions.  Dr. Meade believed that the Plaintiff could frequently climb ramps/stairs, kneel crouch and crawl; could occasionally climb ladders, ropes or scaffolds and stoop, and had an unlimited ability to balance.  The Plaintiff had no manipulative, visual communicative or environmental limitations.  (R:296-98)

On June 9, 2017, the Plaintiff told Dr. Waters that there had been no improvement in her diffuse body pain.  The Plaintiff had not seen her primary care physician or had a sleep study performed.  She had seen her psychiatrist, but no medications were changed.  Dr. Waters increased the Lyrica dosage and

recommended that the Plaintiff exercise one hour per day.  He again suggested a sleep study.  (R: 791-92)

On June 13, 2017, the Plaintiff returned to Dr. Gupta.  Musculoskeletal examination revealed normal strength and range of motion, with no tenderness. The Plaintiff complained of worsening hip pain and a problem with snoring.  An X-ray of the Plaintiff's cervical spine taken on June 20, 2017, showed mild straightening and mild narrowing of the C3-C4 and C4-C5 discs; moderate narrowing of the C5-C6 disc; severe narrowing of the C6-C7 disc, and endplate narrowing at each of these levels. An X-ray of the Plaintiff's lumbar spine showed only mild arthritic changes of the sacroiliac joints.  (R:754-60, 796-97)

The Plaintiff returned to Dr. Gupta on August 4, 2017 to review her X-rays and discuss her current medications.  She reported that she had stopped taking Lyrica because she was having suicidal thoughts.  The Plaintiff stated that she had been seeing Dr. Waters, but wanted a second opinion.  She was not taking medication for her diabetes and was to continue treatment with diet and exercise. The Plaintiff was still taking Zoloft, meclizine and trazodone.  At the time of Dr. Gupta's examination, her height was 5'2" and her weight was 199 pounds. Musculoskeletal examination revealed normal range of motion and strength with no tenderness.  The doctor ordered lab tests.  (R:746-52)

On August 10, 2017, the Plaintiff presented to Mark Moran, M.D., an orthopedist for evaluation of her hip pain.  Physical examination showed tenderness

13

to palpation of both hips, with full range of motion and strength.  Dr. Moran noted that X-rays indicated that the Plaintiff had minimal osteoarthritis in each of her hips, but the location of her pain was consistent with trochanteric bursitis.  The Plaintiff was to be treated with meloxicam and physical therapy.  (R:803-04)

On August 22, 2017, the Plaintiff told Ms. Willis at Henderson that she was experiencing persistent depressive symptoms and wanted to change medications. She reported isolating, feeling sad, having poor focus and motivation, as well as fluctuating sleep and appetite.  The Plaintiff agreed to a trial of Trintellix.  On November 14, 2017, the Plaintiff advised Ms. Willis that her insurance would not authorize Trintellix, and agreed to a trial of mirtazapine.  (R:825-26)

On November 9, 2017, the Plaintiff presented to David Makover, M.D., a rheumatologist for evaluation of her fibromyalgia.  The Plaintiff complained of muscle aches and spasms, fatigue, chronic anxiety and depression, back pain, high stress and poor sleep.  She reported that she failed to respond to treatment with gabapentin, Lyrica and Cymbalta.  She had no muscle weakness, generalized decrease in strength or localized joint pain.  Musculoskeletal examination yielded normal results except for diffuse trigger point tenderness.  Dr. Makover diagnosed fibromyalgia and ordered routine laboratory tests, with no new medications. (R:895-98)

On November 17, 2017, the Plaintiff returned to Dr. Gupta for routine examination.  As in prior examinations, musculoskeletal examination showed

normal strength and range of motion, with no tenderness. The doctor noted that the Plaintiff had new onset of diabetes, for which she prescribed metformin and referred the Plaintiff to an ophthalmologist.  She counseled the Plaintiff, whose weight was 201 pounds, on diet and exercise.  Dr. Gupta also referred the Plaintiff to an ENT specialist to address her complaints of hearing loss.  Subsequent eye examination revealed no diabetic retinopathy (R: 713-19, 809)

On November 30, 2017, the Plaintiff followed up with Dr. Makover, reporting no change in her symptoms.  Musculoskeletal examination revealed no localized swelling; normal back and extremities; no pain elicited by hip motion, and normal strength, but diffuse trigger point tenderness.  Laboratory tests indicated anemia. Dr. Makover did not recommend any medications, but counseled the Plaintiff on weight loss and stress reduction and noted that the Plaintiff needed an anemia workup.  (R:899-902)

On December 28, 2017, the Plaintiff returned to Dr. Gupta, who noted that the Plaintiff's diabetes was worsening. The doctor increased the metformin dosage and again recommended that the Plaintiff see an ENT for evaluation of her hearing loss and snoring.  She also referred the Plaintiff to pain management. (R:693-700)

On January 17, 2018, the Plaintiff presented for initial evaluation to Joseph Alshon, D.O. at Anesthesia Pain Care Consultants.  The Plaintiff's primary complaint was neck pain, and cervical spine examination revealed decreased range of motion with pain.  Dr. Alshon diagnosed cervicalgia and cervical radiculopathy,

15

and recommended aquatic therapy, warm and cold compresses and self-directed exercise.   He prescribed hydrocodone with acetaminophen and Topamax.   On January 29, 2019, the Plaintiff's prescriptions were renewed, with Zohydro added. The Plaintiff's dosages of Topamax and hydrocodone with acetaminophen were increased to one tablet three times per day. (R:871-80)

On February 6, 2018, Plaintiff reported to Ms. Willis that her mental health condition was stable with mirtazapine, which she did not take every night.   The Plaintiff denied depressive symptoms.   (R:824)

On February 23, 2018, Dr. Gupta noted that the Plaintiff was doing well taking metformin for her diabetes.   She was to work with a nutritionist.    The Plaintiff's snoring had improved, but she might need follow-up with an ENT. Musculoskeletal examination continued to show normal strength and range of motion with no tenderness.  (R:673-79)

On March 19, 2018, the Plaintiff returned to Dr. Alshon for pain management.   The Plaintiff complained of low back pain as well as continued neck pain.  She stated that she was unable to fill her Zohydro prescription and that her other medications provided moderate relief with no side effects.    Physical examination revealed decreased range of motion, with moderate tenderness in the Plaintiff's cervical and lumbar spine.    Dr. Alshon renewed the Plaintiff's prescriptions and ordered MRI scans of her cervical and lumbar spine.    The

Plaintiff's condition was unchanged and her prescriptions again were renewed on May 7, 2018. (R:810-15, 859-63)

On May 16, 2018, Dr. Gupta prescribed CPAP therapy for the Plaintiff's obstructive sleep apnea.  On May 21, 2018, the Plaintiff presented to Dr. Gupta for routine follow-up.  She complained of pain in her upper abdomen. The doctor recommended Prilosec, smaller meals and avoidance of late-night meals.  He noted that the Plaintiff's obesity and sleep apnea were worsening, and directed her to utilize the CPAP machine.   (R: 651-57, 819)

On May 24, 2018, the Plaintiff met with Celeste Boyd, A.R.N.P. at Henderson.  The Plaintiff's mood was fairly stable, with circumstantial stressors noted.  Ms. Boyd determined to discontinue mirtazapine and to re-start the Plaintiff on Zoloft and trazodone.  (R:823)

On June 6, 2018, the Plaintiff returned to Dr. Alshon.  She told the doctor that she was experiencing adequate analgesia with the current regimen, without side effects.  She reported an increased ability to do activities of daily living.  Dr. Alshon added tizanidine to the Plaintiff's medications.  (R:853-57)

On June 13, 2018, the Plaintiff participated in an at-home sleep study, which revealed mild obstructive sleep apnea and severe desaturation during sleep.  It was recommended that the Plaintiff discuss with her physician alternatives to CPAP therapy.  (R:816-17)

On July 13, 2018, another consultative physical examination of the Plaintiff was performed by Roland D. Kaplan, D.O. of the Broward Spine Institute. The Plaintiff told Dr. Kaplan that she had been diagnosed with fibromyalgia in 2007. She experienced headache and neck and should pain, occasionally radiating to both wrists, as well as localized back pain with no numbness or tingling. Physical examination revealed that the Plaintiff ambulated with a nonantalgic gait; heel and toe walking was grossly intact; she could stoop and stand from a stooped position; deep tendon reflexes were normal; sensation was grossly intact; she had full motor strength; modified straight leg raise was negative bilaterally; overhead reach was intact; she was neurovascularly grossly intact distally in upper and lower extremities; she could obtain an item off the floor; cervical spine range of motion was grossly within functional limits; final motor coordination was intact, and gait was within normal limits. Dr. Kaplan's assessment was fibromyalgia by history. (R:596)

Based on his examination, Dr. Kaplan completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). He opined that the Plaintiff could lift/carry 21-50 pounds occasionally, 11-20 pounds frequently and up to 10 pounds continuously; she could sit, stand or walk for 2 hours without interruption; she could sit for 6 hours during an 8-hour workday and stand/walk for 4 hours during that time period. She did not require a cane to ambulate. Dr. Kaplan stated that the Plaintiff could continuously reach, handle, finger, feel and push/pull with

each hand, and could occasionally operate foot controls with each foot. She could never climb ladders or crawl, and she occasionally could climb stairs and ramps, balance, stoop, kneel and crouch. The Plaintiff could never be exposed to unprotected heights, but occasionally could be around moving mechanical parts. humidity and wetness, dust, odors and fumes, extreme cold; extreme heat and vibrations. The Plaintiff could occasionally operate a motor vehicle and could tolerate moderate noise, such as the noise level in an office. The Plaintiff could perform activities like shopping; travel without a companion; ambulate without an assistive device; use standard public transportation; climb a few steps at a reasonable pace with a single hand rail; prepare a simple meal and feed herself; care for her personal hygiene, and sort, handle and use paper/files. (R:589-94)

On July 19, 2018, Dahlia V. Gordon, Psy.D., issued a report on a consultative psychological evaluation of the Plaintiff which included an interview and a battery of tests. (R:600-607) The Plaintiff reported intermittent depressive symptoms and symptoms of anxiety, as well as poor sleep resulting from her husband's PTSD. The Plaintiff admitted that she sometimes takes more of her opioid medication than what is prescribed. (R:600, 602, 606)

Dr. Gordon found that the Plaintiff was performing in the low average range of intellectual functioning with a full scale score of 82. Testing revealed patterns of performance which could be explained by varying levels of attention or varying levels of effort. Dr. Gordon gave the Plaintiff the benefit of the doubt because there

was no blatant malingering.    She found that the Plaintiff did not have an intellectual disability, and had fair judgment and insight.  The Plaintiff was capable of performing simple and repetitive tasks, but might make errors at times owing to the lack of attention to detail.  Dr. Gordon's diagnostic impression was Unspecified Depressive Disorder (controlled with psychotropic medication); Unspecified Anxiety Disorder (rule out Generalized Anxiety Disorder), and Unspecified Neurocognitive Disorder (ADHD-like symptoms/rule out ADHD).  (R:604-07)

Also on July 19, 2018, Dr. Gordon completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental).  She opined that the Plaintiff had mild restrictions in her abilities to understand and remember simple instructions; carry out simple instructions; understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions.  The Plaintiff had no restrictions in her ability to make judgments on simple work-related decisions.   Dr. Gordon noted that the Plaintiff exhibited varying levels of attention, focus and concentration.    The Plaintiff had no restrictions in her abilities to interact appropriately with the public, supervisors and co-workers, or her ability to respond appropriately to usual work situations and changes in a routine work setting.   In addition to her varying levels of attention and concentration, the Plaintiff's reliability might be limited by depression and anxiety.  Test scores reflected variability in the Plaintiff's performance, and she described a tendency to become overwhelmed.   Dr. Gordon suggested that

abstinence from opioids might improve the Plaintiff's concentration, but could also result in increased pain. (R:608-09)

On July 30, 2018, the Plaintiff returned to Dr. Alshon for refills of her medication.  She stated that back and neck pain was tolerable with her current medication regimen, without side effects.  Physical examination continued to show decreased range of motion in the Plaintiff's cervical and lumbar spine, with tenderness to palpation.  Dr. Alshon continued the Plaintiff on the medications he had prescribed for her.  (R:848-52)

On August 23, 2018, the Plaintiff reported to Ms. Boyd that her mood had been stable and her depression manageable.  The Plaintiff was cooperative, with clear and coherent speech, with good mood and congruent affect.  Her thought process was circumstantial and her thought content was appropriate.  The Plaintiff reported that her appetite, energy and sleep all were good, and she denied feelings of hopelessness or helplessness.   Ms. Boyd continued the Plaintiff on her medications.  (R:821)

On September 7, 2018, the Plaintiff presented to Dr. Gupta for routine follow-up.  Musculoskeletal examination once again revealed normal strength and range of motion with no tenderness.  The Plaintiff had developed elevated blood pressure and skin lesions.  The doctor directed the Plaintiff to keep a blood pressure log and referred her to dermatology. (R:930-36)

On September 17, 2018, the Plaintiff returned to Dr. Alshon for pain management. She stated that her pain was not improving, but the medications helped. Physical examination continued to show decreased range of motion and tenderness on palpation in the Plaintiff's cervical spine. Dr. Alshon's diagnosis was cervicalgia, and he found that the Plaintiff was a candidate for Diagnostic Facet Joint Injections/medial branch nerve blocks of the involved facet joints. He renewed her prescription for hydrocodone with acetaminophen and added Enulose. (R:11477-52)

On September 21, 2018, the Plaintiff presented to the Broward Health Emergency Department for treatment of back pain. On physical examination, the Plaintiff's back was non-tender with normal range of motion, but she had paralumbar spasm. X-rays of her lumbar spine were normal. She was diagnosed with back strain and discharged with prescriptions for cyclobenzaprine and ibuprofen. (R:963-68)

On October 29, 2018, the Plaintiff told Dr. Alshon that her neck pain had increased and nothing was helping. Examination of the Plaintiff's cervical spine showed no changes and Dr. Alshon again stated that the Plaintiff was a candidate for Diagnostic Facet Join Injections. Her prescriptions for hydrocodone with acetaminophen and Enulose were renewed. (R:1141-46)

At the administrative hearing, the Plaintiff testified that she was a high school graduate and had worked in customer service for Aetna in 2006 and 2007.

This job involved taking customer orders for medication and packing them for delivery.  The Plaintiff believed that the medication boxes weighed 20 to 25 pounds. She was on her feet for half the day and seated for the remainder. The ALJ noted that during the Plaintiff's testimony at her prior disability hearing she made no mention of loading boxes.  The Plaintiff responded that she did a lot of things at Aetna.  (R:234-39, 250-52)

The Plaintiff stated that she was unable to work because of severe pain in her neck, shoulder and back, as well as fatigue from fibromyalgia.  She related that she was depressed because of the pain and it was difficult for her to get out of bed.  Her husband did the cooking and cleaning.   The Plaintiff took Vicodin for pain, meclizine for dizziness, cyclobenzaprine for spasms, Topamax for nerves, metformin for diabetes, Vitamin D for vitamin deficiency, omeprazole for acid reflux and trazadone for sleep problems.  She spent most of each day in bed.  The Plaintiff was 5'2" tall and weighed 190 pounds.  (R:239-43)

The Plaintiff testified that her fibromyalgia tender points were in her neck, shoulder, lower back, wrists and legs.  The pain medication helped until it wore off and she needed to take more.  She was going to get an injection for the pain in her neck on the Friday after the hearing.  The Plaintiff stated she had some residual balance problems resulting from her broken ankle.   Complications from diabetes included dizziness, pain near her kidney and excessive hunger.  (R:244-46)

Regarding her mental problems, the Plaintiff testified that she forgot names and had to constantly write things down.  She attributed her memory problems to fibromyalgia.  The Plaintiff was depressed because of her physical state.  She also became dizzy when getting up after being seated.  She did not believe she could sit for hours because of pain in her shoulders and lower back.  (R:247-48)

Arthur Lorber, M.D., a board certified orthopedic surgeon, testified as a medical expert (ME).  Counsel for the Plaintiff made no objection to Dr. Lorber's qualifications.  The ME stated that he had reviewed the entire medical record, and asked the Plaintiff a few questions about her medications and other treatments.  He testified that the Plaintiff's diabetes was controlled, with no evidence of end organ disease or other related impairment.  The ME also testified that the record showed no evidence that the Plaintiff suffered from rheumatoid arthritis and she was taking no medications designed to treat that condition.  There also was no documentation of any hearing loss, and the Plaintiff had no difficulty conversing with the ME.  Moreover, no doctor ever had prescribed hearing aids for the Plaintiff. (R:252-58)

Regarding the Plaintiff's diagnosis of fibromyalgia, the ME acknowledged that Dr. Waters, an arthritis specialist, had written a letter in 2012 stating that the Plaintiff could not work because of fibromyalgia.  The ME pointed out that fibromyalgia is a diagnosis of exclusion, and could not be present together with other conditions such as arthritis of the neck or spine.  He noted that the Plaintiff

24

was not being treated with medications designed to treat fibromyalgia, such as Neurontin or Lyrica, and the record did not reflect the location of her trigger points or the amount of pressure employed to elicit a response. He pointed out that fibromyalgia is not treated with narcotics. The ME opined that in light of the Plaintiff's multiple other complaints, fibromyalgia was not a proper diagnosis. (R:258-59, 263)

The ME noted Dr. Shrock's diagnosis of meralgia paresthetica, which is a peripheral sensory nerve irritation rather than a spinal disorder. Additionally, although X-rays of the Plaintiff's cervical spine showed disc narrowing, it did not meet the Listing requirements. There was no evidence of impairment relating to the Plaintiff's sleep apnea, as she was not using a CPAP machine. Additionally, the Plaintiff had no impairments relating to her hips or left foot. (R:259-61)

Based on his analysis of the medical record, the ME opined that the Plaintiff retained the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently and to stand/walk or sit for a total of 8 hours per day, no more than 1 hour at a time. She should avoid exposure to concentrated vibration and could only frequently engage in overhead reaching with either upper extremity. According to the ME, the Plaintiff did not have any other exertional, environmental, positional or manipulative restrictions, and would not require a break when shifting between standing and sitting positions. (R:261-62)

Pamela Leggett, a vocational expert (VE) testified that the Plaintiff's job at Aetna comprised three classifications: customer service clerk (sedentary with an SVP of 6); hand packager (medium with an SVP of 2), and order clerk (sedentary with an SVP of 4). The ALJ asked the VE to assume an individual who could lift up to 50 pounds occasionally; could stand for a total 4 hours per day, 2 hours at a time; could sit/walk for a total of 4 hours per day, 2 hours at a time; could never crawl, climb ladders or scaffolds or be exposed to unprotected heights. The VE testified that such a person could perform all three aspects of the Plaintiff's prior job. (R:267-69)

The Plaintiff told the ALJ that she was not taking medication designed for fibromyalgia because she could not tolerate Lyrica or gabapentin. The Plaintiff stated that she had taken her pain medication the day of the hearing. The ALJ noted that the Plaintiff had shown no drowsiness or lack of attention. She also showed no signs of discomfort sitting for one hour during the hearing. (R:272)

## III. DECISION OF THE ALJ

The ALJ began by finding that the Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2018, and had not engaged in substantial gainful activity between her alleged onset date of July 31, 2014 and the date on which she was last insured. Through the date last insured, the Plaintiff had the severe impairments of degenerative spondylosis of the cervical spine,

obesity and obstructive sleep apnea.   The ALJ found that the Plaintiff's

impairments of diabetes, headaches, rheumatoid arthritis, hearing loss,

fibromyalgia, meralgia paresthetica and degenerative disc disease of the lumbar

spine all were not severe.  As to these impairments, the ALJ determined that the

was a lack of medical records which would support findings of severity.  (R:13-14)

The ALJ primarily based these findings on the hearing testimony of the ME,

which he summarized. (R:14-15)  The ALJ accorded great weight to the ME's

assessments because they were supported by the medical evidence, and were based

on the ME's program knowledge and his experiences as an independent, objective,

neutral and impartial medical expert evaluating Social Security disability claims.

Additionally, the ME had reviewed the medical record and offered a thorough

analysis of the medical evidence, as well as an insightful and persuasive

explanation in support of his opinion.  The ALJ determined that the ME's opinion

was consistent with the record as a whole.  (R:15)

Based on the ME"s opinion, the ALJ concluded that the Plaintiff's

fibromyalgia was not a medically determinable impairment.  The ALJ referred to

Social Security Ruling (SSR) 12-2p, which sets forth criteria for determining that

fibromyalgia is a medically determinable impairment of a claimant.  One basis for

such a determination is the 1990 American College of Rheumatology Criteria for the

Classification of fibromyalgia, which requires all three of the following: a history of

widespread pain in all quadrants of the body that has persisted for at least three

months; at least 11 positive tender points on physical examination, which must be found bilaterally and both above and below the waist, and evidence that other disorders that could cause the symptoms or signs were excluded. The other basis for a finding of fibromyalgia is the 2010 College of Rheumatology Criteria for the Classification of Fibromyalgia require all three of the following: a history of widespread pain in all quadrants of the body that has persisted for at least three months; repeated manifestation of six or more fibromyalgia symptoms, signs, or co-occurring conditions, and evidence that other disorders that could cause these repeated manifestations of symptoms, signs or co-occurring conditions were excluded. Id.

The ALJ acknowledged that the Plaintiff's medical records were replete with her complaints of pain secondary to various physical impairments, including arthritis and fibromyalgia, but agreed with the ME that the record failed to support a finding that many of these impairments were severe, or in the case of fibromyalgia, medically determinable.  The ALJ referred to repeated examination findings indicating that the Plaintiff had normal strength, with no tenderness, swelling or deformity throughout her musculoskeletal system; normal range of motion; normal gait, and normal motor function.  Examinations revealing trigger point tenderness contained no description of the testing completed to confirm the presence of these trigger points.  The ALJ also pointed out that on May 7, 2017, the Plaintiff herself denied the presence of any unusual joint pain, immobility of loss of

function.   Moreover, X-rays and other imaging of the Plaintiff's lumbar spine revealed no detectable abnormality. While acknowledging Dr. Waters' 2012 letter which stated that fibromyalgia rendered the Plaintiff unable to work, the ALJ accorded little weight to this opinion because it was not supported by the totality of the evidence. (R:15-17)

The ALJ also determined that the Plaintiff's mental impairment of depression was not severe because this condition did not cause more than minimal limitation in the Plaintiff's ability to perform basic mental work activities in any of the four pertinent areas of functioning.  The ALJ found that the Plaintiff had mild limitations in the areas of understanding, remembering or applying information; interacting with others; concentration, persistence or pace, and ability to adapt or manage herself.  The ALJ based these findings on the Plaintiff's ability to answer questions and provide information at the hearing; her interactions with her doctors; her minimal psychiatric treatment, and the fact that the medical record suggested that the Plaintiff's medications were effective in alleviating her mental symptomology.  (R:17-19)

Based on what he described as the unconvincing medical evidence, the ALJ accorded little weight to the psychiatric review technique forms completed by Dr. Pack and Dr. Chase, the non-examining state agency consultants, who opined that the Plaintiff's mental impairment was severe.  The ALJ noted that the consultants' opinions were based on finding that the Plaintiff had moderate limitations in

concentration, persistence and pace, for which the ALJ found insufficient corroborating evidence in the record, particularly in light of the general lack of mental health treatment obtained by the Plaintiff during the period at issue. The ALJ gave great weight to the consultative examination report of Dr. Gordon, who found that the Plaintiff had only mild limitations in her abilities to understand, remember or carry out both simple and complex instructions, and no limitations in her abilities to interact appropriately with the public, supervisors and co-workers and to respond appropriately to usual work situations and changes in a routine work setting. Thus, to the extent that Dr. Gordon's findings were consistent with the ultimate finding that the Plaintiff's mental impairments were not severe, the ALJ gave Dr. Gordon's opinions great weight as they were supported by the totality of the evidence. (R:19)

The ALJ next found that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one or more of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ determined that medical records did not establish the requirements of Listing 1.04, disorders of the spine. Additionally, the ALJ noted that there was no listing for obesity and that this impairment did not medically equal any listing. However, the ALJ had taken into account the limiting effect of the Plaintiff's obesity in arriving at his residual functional capacity assessment. (R:20)

The ALJ assessed that through the date last insured, the Plaintiff retained the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently, and could stand and/or walk and sit for 8 hours per day, but for 1 hour at a time allowing for a brief change of position in place. The Plaintiff needed to avoid exposure to concentrated vibrations and constant overhead reaching with either upper extremity, but she could reach overhead frequently. After briefly summarizing the Plaintiff's hearing testimony regarding her pain and physical limitations, the ALJ found that although the Plaintiff's medically determinable impairments reasonably could be expected to cause some of the alleged symptoms and limitations, the magnitude of the pain and the extent of the symptoms to which the Plaintiff attested were not supported by medically acceptable clinical and diagnostic techniques. Moreover, there was insufficient objective medical evidence that the Plaintiff's asserted impairments were of such severity that they could reasonably be expected to give rise to the alleged pain and functional limitations. (R:20-21)

The ALJ acknowledged that the medical record consistently reflected the Plaintiff's complaints of pain, but pointed out that subjective complaints of pain must be verifiable by objective evidence, which was absent from the record. The ALJ pointed out that the findings in Dr. Adam's report of her consultative examination of the Plaintiff primarily were based on the Plaintiff's subjective complaints of her experience of pain. The ALJ contrasted Dr. Adams' findings with

other examination reports in the record which showed normal movement of all extremities, normal gait, and normal muscle strength and tone, including one examination which took place four days prior to the one performed by Dr. Adam. The ALJ stated that these inconsistencies rendered Dr. Adam's findings less persuasive, and he accorded little weight to the doctor's report. (R:21-22)

Regarding the Plaintiff's alleged physical limitations, the ALJ pointed out that although X-rays of the Plaintiff's cervical spine revealed severe narrowing of the C6-C7 cervical disc, there was only mild narrowing at C3-C4 and C4-C5, moderate narrowing at C5-C6 and mild straightening of the cervical spine. While the imaging did confirm the presence of a severe impairment, the objective medical evidence did not support a further determination that the Plaintiff was incapable of work activity. The ALJ noted that the Plaintiff underwent a second physical consultative examination on July 13, 2018 by Dr. Ronald Kaplan. Dr. Kaplan found that the Plaintiff retained the abilities to lift up to 50 pounds occasionally and 20 pound frequently and to stand/walk or sit for a total of 8 hours per day. To the extent consistent with the ALJ's residual functional capacity assessment, the ALJ accorded great weight to Dr. Kaplan's opinion. The ALJ accorded little weight to the records pertaining to the Plaintiff's history of pain management because the treatment was aimed toward alleviating the Plaintiff's subjective complaints. (R:22-24)

The ALJ also acknowledged that the medical record confirmed the Plaintiff's diagnosis of sleep apnea, but there was no indication that this condition was disabling, either individually or in combination with her other impairments. Diagnostic testing revealed that the Plaintiff's obstructive sleep apnea was only mild in nature.  (R:24)

The ALJ noted that the totality of the evidence was suggestive of a level of exaggeration on the Plaintiff's part.  The ALJ pointed to the findings of Dr. Gordon that tests for malingering suggested slight exaggeration.   Additionally, the Plaintiff's hearing testimony that while working at Aetna she was on her feet half the time and had to lift boxes weighing 20-25 pounds was in stark contrast to her 2014 hearing testimony that in performing that job she sat at a desk all day.  The ALJ concluded that overall, the evidence suggested that the Plaintiff consistently had attempted to portray limitations that were not actually present in order to increase her chance of obtaining benefits, and this exaggeration rendered her subjective complaints less persuasive.  (R:24)

The ALJ referred to the assessment of non-examining physician Dr. Larry Meade, who found that the Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently; could stand/walk or sit for a total of about 6 hours during an 8-hour workday and had an unlimited ability to push/pull with lifting and carrying restrictions.  Dr. Meade also found that the Plaintiff had only minimal postural limitations and no manipulative, visual, communicative or environmental

limitations.   The ALJ gave great weight to Dr. Meade's opinion to the extent consistent with the ALJ's residual functional capacity assessment.  Id.

The ALJ conceded that the Plaintiff had described daily activities which were fairly limited.  However, such limited activities could not be objectively verified with any reasonable degree of certainty.  Moreover, to the extent that the Plaintiff's daily activities truly were as limited as she alleged, it was difficult to attribute that degree of limitation to the Plaintiff's medical condition, as to other reasons. Id.

The ALJ noted that the VE testified that the Plaintiff was capable of performing all of her past relevant work.  However, the ALJ pointed out that his own residual functional capacity assessment was more restrictive than that assessed by Dr. Roland (as incorporated in the hypothetical presented to the VE), since the ALJ found that the Plaintiff could lift only 20 pounds occasionally and 10 pounds frequently.  Accordingly, the ALJ concluded that the Plaintiff was capable of performing only her past jobs of customer service clerk and order clerk, since these jobs required only sedentary exertion.  Based on this conclusion, the ALJ found that during the relevant time period the Plaintiff was not under a disability as defined by the Social Security Act.

## IV. CROSS MOTIONS FOR SUMMARY JUDGMENT

The Plaintiff asserts two grounds for relief: (1) the ALJ's residual functional capacity assessment was not based on substantial evidence because the ALJ failed

to properly assess the Plaintiff's fibromyalgia and mental impairment, and (2) the ALJ failed to properly credit the Plaintiff's subjective complaints.

The Commissioner contends that the decision of the ALJ must be affirmed because it is supported by substantial evidence and the correct legal standards were applied.

## V. RECOMMENDATIONS OF LAW

At issue before the Court is whether the final decision of the Commissioner, as reflected by the record, is supported by substantial evidence. "Even if the evidence preponderates against the Secretary, we must affirm if the decision is supported by substantial evidence." Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1985). Substantial evidence is defined as such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389 (1971); Bloodsworth v. Heckler, 703 F.2d 1233 (11th Cir. 1983). The Court must review the record as a whole to determine if the decision is supported by substantial evidence. Bloodsworth, 703 F.2d at 1239. The Court must also determine whether the Administrative Law Judge applied the proper legal standards. No presumption of validity attaches to the Commissioner's determination of the proper legal standards to be applied. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993) (citing Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987)).

In making a disability determination, the ALJ must perform the sequential evaluation outlined in 20 C.F.R. § 404.1520. First the claimant must not be engaged in substantial gainful activity after the date the disability began. Second, the claimant must provide evidence of a severe impairment. Third, the claimant must show that the impairment meets or equals an impairment in Appendix 1 of the Regulations. If the claimant fails to provide sufficient evidence to accomplish step three, the analysis proceeds to step four. In step four, the ALJ must determine the claimant's residual functional capacity, then determine if the claimant can perform his or her past relevant work. The claimant has the burden of proving the inability to perform past relevant work. If the claimant's evidence shows an inability to perform past relevant work, the burden shifts to the ALJ in step five. The ALJ must show that there is other gainful work in the national economy which the claimant can perform. Once the ALJ identifies such work, the burden returns to the claimant to prove his or her inability to perform such work.

**A. Assessment of the Plaintiff's Impairments**

    1. Fibromyalgia

The Plaintiff first contends that the ALJ failed to properly assess her fibromyalgia in determining that she had failed to demonstrate that she suffered from this condition. Evaluation of fibromyalgia by an ALJ is governed by SSR-2p, which sets forth two alternative methods, which were cited by the ALJ in the instant case: the 1990 American College of Rheumatology Criteria for the

Classification of fibromyalgia, which requires all three of the following: a history of widespread pain in all quadrants of the body that has persisted for at least three months; at least 11 positive tender points on physical examination, which must be found bilaterally and both above and below the waist, and evidence that other disorders that could cause the symptoms or signs were excluded, or the 2010 College of Rheumatology Criteria for the Classification of Fibromyalgia require all three of the following: a history of widespread pain in all quadrants of the body that has persisted for at least three months; repeated manifestation of six or more fibromyalgia symptoms, signs, or co-occurring conditions, and evidence that other disorders that could cause these repeated manifestations of symptoms, signs or co-occurring conditions were excluded.

In finding that the Plaintiff had not established fibromyalgia by either of these methods, the ALJ cited the hearing testimony of the ME.  The ALJ also took note of repeated examination findings indicating that the Plaintiff had normal strength, with no tenderness, swelling or deformity throughout her musculoskeletal system; normal range of motion; normal gait, and normal motor function. Examinations revealing trigger point tenderness contained no description of the testing completed to confirm the presence of these trigger points.  The ALJ also pointed out that on May 7, 2017, the Plaintiff herself denied the presence of any unusual joint pain, immobility of loss of function.  Moreover, X-rays and other imaging of the Plaintiff's lumbar spine revealed no detectable abnormality.

The ALJ's finding that the Plaintiff had not demonstrated that she suffered from fibromyalgia is supported by her treatment history. The undersigned notes that there was a nearly three-year gap in the Plaintiff's treatment by her rheumatologist, Dr. Barry Waters, between 2013 and 2016. On December 1, 2016, the Plaintiff told Dr. Waters that her fibromyalgia had worsened, and that she would like to try a new medication because she had been unable to tolerate Cymbalta or Savella. Dr. Waters started the Plaintiff on Lyrica. When the initial trial of Lyrica failed to provide relief, Dr. Waters increased the dosage and instructed the Plaintiff to exercise one hour per day.

A few months later, the Plaintiff told Dr. Gupta that she had been seeing Dr. Waters, but that she had stopped taking Lyrica and wanted a second opinion. On November 9, 2017, Plaintiff was evaluated by another rheumatologist, Dr. Makover, who ordered tests, but counseled the Plaintiff on weight loss and did not prescribe any new medications. Meanwhile, the Plaintiff's mental health counselor prescribed gabapentin, another fibromyalgia medication, because the Plaintiff complained that she had developed restless leg syndrome with Zoloft. However, the Plaintiff testified at the administrative hearing that she could not tolerate gabapentin either.

On December 28, 2017, the Plaintiff obtained a pain management referral from her primary care physician, Dr. Gupta. Shortly thereafter, she presented to Dr. Alshon, who diagnosed cervicalgia and cervical radiculopathy, for which he

prescribed hydrocodone with acetaminophen and Topamax. The Plaintiff reported to Dr. Alshon that these medications were effective in relieving her pain. She continued taking them through the date of the hearing and did not return to either of her treating rheumatologists.

In light of the failure of all fibromyalgia medications and the apparent relief provided by opioids, it was reasonable for the ALJ and the ME to find that the Plaintiff's pain was not caused by fibromyalgia, but by other conditions such as cervicalgia and osteoarthritis, for which there was support by diagnostic imaging. As the ME emphasized, fibromyalgia is not treated with narcotics, and in light of the Plaintiff's multiple other complaints, fibromyalgia was not a proper diagnosis. Moreover, the undersigned notes that the Plaintiff did not obtain a treating physician's opinion on the effects of her fibromyalgia, as she had done in her prior application for disability. Accordingly, the undersigned concludes that substantial evidence in the record supports the ALJ's finding that the Plaintiff did not establish the impairment of fibromyalgia.

2. Mental Impairments

The Plaintiff next contends that the ALJ did not properly evaluate her mental impairments. The Plaintiff notes that two non-examining state agency consultants had determined that the Plaintiff suffered from severe depression resulting in moderate limitations in her abilities to carry out detailed instructions and to complete a normal workday and workweek without interruptions from

psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Instead, the ALJ relied on the opinion of consultative examiner Dr. Gordon, which the Plaintiff contends also lends support to her claims of mental problems.

The ALJ found that the Plaintiff had mild limitations in the areas of understanding, remembering or applying information; interacting with others; concentration, persistence or pace, and ability to adapt or manage herself.  The ALJ based these findings on the Plaintiff's ability to answer questions and provide information at the hearing; her interactions with her doctors; her minimal psychiatric treatment, and the fact that the medical record suggested that the Plaintiff's medications were effective in alleviating her mental symptomology.

The ALJ accorded little weight to the psychiatric review technique forms completed by the non-examining state agency consultants, who opined that the Plaintiff's mental impairment was severe.  The ALJ  determined that their opinions were based on findings of moderate limitations in concentration, persistence and pace, for which the ALJ found insufficient corroborating evidence in the record, particularly in light of the general lack of mental health treatment obtained by the Plaintiff during the period at issue.  The ALJ gave great weight to the consultative examination report of Dr. Gordon, who found that the Plaintiff had only mild limitations in her abilities to understand, remember or carry out both simple and complex instructions, and no limitations in her abilities to interact appropriately

40

with the public, supervisors and co-workers and to respond appropriately to usual work situations and changes in a routine work setting.

The undersigned finds that the ALJ clearly was entitled to accord greater weight to the opinion of Dr. Gordon, who conducted a complete examination of the Plaintiff, including a battery of tests, in 2018, than he did to the opinions of Dr. Chase and Dr. Pack, who did not examine the Plaintiff, but reviewed the records available in 2017.  The undersigned notes that the Plaintiff's psychiatric treatment consisted of periodic visits to Henderson Behavioral Health for medication refills, during which the Plaintiff frequently denied depressive symptoms.

The undersigned also agrees with the ALJ that the Plaintiff's interactions with her physicians and her hearing testimony revealed no indications of memory problems.  For example, the Plaintiff recited the list of her multiple medications without hesitation. (R:241-42)  At the hearing, the ALJ noted that the Plaintiff showed no drowsiness or lack of attention at the hearing and was able to focus on what she was doing, indicating a lack of side effects from the pain medication she had taken that day.  (R:272)  In sum, there was substantial evidence in the record to support the ALJ's finding that the Plaintiff's mental impairment was not severe.

## B. **The Plaintiff's Subjective Complaints**

The Plaintiff's final contention is that the ALJ failed to accord proper weight to her subjective complaints of pain.  Pain must be evaluated by considering the

41

"evidence of an underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from that condition, or (2) that the objectively determined medical condition is of a severity that can reasonably be expected to give rise to the alleged pain." Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).   The ALJ also can consider the plaintiff's daily activities, the precipitating factors and the effect of medication and other treatment. 20 C.F.R. § 404.1529(3).

In the instant case, the ALJ found that the Plaintiff's impairments could be expected to give rise to her alleged symptoms, but not to the extent she alleged, he noted that the totality of the evidence was suggestive of a level of exaggeration on the Plaintiffs part, pointing to the findings of Dr. Gordon that tests for malingering suggested slight exaggeration.   Additionally, the Plaintiff's hearing testimony that while working at Aetna she was on her feet half the time and had to lift boxes weighing 20-25 pounds was in stark contrast to her 2014 hearing testimony that in performing that job she sat at a desk all day.   The ALJ concluded that overall, the evidence suggested that the Plaintiff consistently had attempted to portray limitations that were not actually present in order to increase her chance of obtaining benefits, and this exaggeration rendered her subjective complaints less persuasive.

The ALJ also pointed out that the findings in Dr. Adam's report of her consultative examination of the Plaintiff primarily were based on the Plaintiff's

42

subjective complaints of her experience of pain. The ALJ contrasted Dr. Adams' findings with other examination reports in the record which showed normal movement of all extremities, normal gait, and normal muscle strength and tone, including one examination which took place four days prior to the one performed by Dr. Adam. Similarly, the undersigned notes that in none of the multiple musculoskeletal examinations performed by Dr. Gupta, the Plaintiff's primary care physician, was there any evidence of tenderness or decreased range of motion. The Plaintiff displayed these symptoms only during examinations by her rheumatologists and pain management specialist.

Considering the objective medical evidence, the undersigned finds that the ALJ's decision to accord less than full weight to the Plaintiff's subjective complaints is supported by substantial evidence in the record. Therefore, the ALJ's decision that the Plaintiff was not under a disability during the relevant time period should not be disturbed.

## VI. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the Plaintiff's Motion for Summary Judgment be DENIED and the Commissioner's Motion for Summary Judgment be GRANTED.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written

objections, if any, with the Honorable William P. Dimitrouleas, United States District Judge.  Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained therein, except upon grounds of plain error if necessary in the interest of justice.  See 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140, 149 (1985); Henley v. Johnson, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 10th day of March, 2021.

_____
LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

All Counsel of Record